COMMONWEALTH OF VIRGINIA *v.* STATE OF WEST VIRGINIA.

IN EQUITY.

No. 7, Original. Argued March 11, 12, 1907.—Decided May 27, 1907.

This court has original jurisdiction of a suit by the State of Virginia against the State of West Virginia for an accounting as between the two States, and, in order to a full and correct adjustment of the accounts to adjudicate and determine the amount, if any, due the former by the latter.

Consent to be sued in this court by another State is given by a State, by, and at the time of, its admission into the Union. It will be presumed that the legislature of a State will provide for the satisfaction of any judgment that may be rendered against it, and the jurisdiction and power of this court is not affected by the question of how it will be enforced. If a State should repudiate its obligation to satisfy judgment rendered against it, this court will after the event consider the means by which it may be enforced.

The court having jurisdiction of the controversy, the effect of the provisions in the constitution of West Virginia, as well as the several statutes enacted

by that State and by Virginia on the liability of West Virginia, for a part of the public debt of Virginia, and the relations of Virginia to the holders of bonds will not be determined on demurrer, but postponed to the merits.

THIS is a bill filed, on leave, February 26, 1906, by the Commonwealth of Virginia against the State of West Virginia.

The bill averred that—

"On the first day of January, 1861, complainant was indebted in about the sum of $33,000,000 upon obligations and contracts made in connection with the construction of works of internal improvement throughout her then territory. By far the greater part of this indebtedness was shown by her bonds and other evidences of debt, given for the large sums of money which she from time to time had borrowed and used for the above purpose; but a portion of her liabilities though arising under contracts made before that date, had not then been covered by bonds issued for their payment.

"In addition to the above liability to the general public, there was a large indebtedness evidenced by her bonds and other liabilities held by and due to the Commissioners of the Sinking Fund and the Literary Fund of the State, as created under her laws amounting, the former to $1,462,993.00, and the latter to $1,543,669.05 as of the same date.

"The official reports and records showing the exact character and amounts of the public debt thus contracted and how the same was created, are referred to, and will be produced upon a hearing of the case.

"(2) That portion of the territory embraced in what constitutes the present territorial limits of Virginia was prior to that date devoted mainly to agriculture, and to some extent to grazing and manufacturing, which afforded its chief sources of revenue, while that portion included in what now constitutes the State of West Virginia had vast potentialities of wealth and revenue in the undeveloped stores of minerals and timber, which had been known for many years prior to the date named, and their prospective values, if made accessible to the markets of the country, were understood to be well

nigh beyond computation. It was to hasten and facilitate the development of these sources of wealth and revenue by the construction of graded roads, bridges, canals and railways, extending through the State from tidewater towards the Ohio River, that the Commonwealth of Virginia, in the first quarter of the Nineteenth Century, entered upon a system of public internal improvements, which it was contemplated should include the entire territory of the State, and embraced in its design the construction of public works adapted, not to the needs of any one portion of the State alone, but of the entire State, as a unit of interest. The larger part of these works were constructed East of the Appalachian range, as leading up to the undeveloped territory West thereof, but a very considerable portion of them were, at an expense of several millions of dollars, constructed West of said range within the territory now included in the State of West Virginia; and the completion of some of the main lines of improvement beyond the said range and through to the Ohio River, since the first day of January, 1861, has increased to a very great and material extent the values of real estate, including coal and timber, in the said territory now included in West Virginia, thus carrying into effect the original scheme of improvement, which could not have been done had not the lines East of said range been first constructed; and your oratrix believes and avers that the property values within the limits of West Virginia have been enormously enhanced in a large measure by reason of these improvements. The money appropriated to the payment of the annually accruing interest on the said debt, prior to January 1, 1861, and to the formation of the Sinking Fund for the ultimate redemption thereof, was derived from taxes imposed upon the property subject to taxation throughout the entire State. The first of this indebtedness to be contracted was a small amount borrowed by the State in the year 1820 and the debt was thereafter from time to time continued and increased by renewals and new loans until it reached the amount above stated in 1861.

" (3). The Commonwealth of Virginia was induced to enter upon the construction of this general system of internal improvement, in a. very large measure for the purpose of developing the aforesaid resources of the western portion of the State, now constituting the State of West Virginia, thereby ameliorating the condition of her citizens residing therein; and it was with this view that she took upon herself the burden of the public debt for which her bonds were issued, without which debt such improvements could not have been undertaken. In corroboration of this view it will appear from an inspection of the legislative records of the State, where the vote carrying the appropriations for such public improvements was recorded, that in nearly every instance a majority of those members of the House and Senate of the original State, who then represented the counties now composing West Virginia, voted for such appropriations. Indeed it appears from those records that a great majority of the acts of the legislature of Virginia under which said indebtedness was created, would have failed of their passage, had the representatives from the counties embraced in what is now West Virginia opposed their enactment, and that a very large proportion of said indebtedness was actually contracted over the votes of a majority of the representatives from the counties and cities embraced in the limits of the present State of Virginia. This will be found to be true, not only in the legislature for one single session, but in the legislatures for many successive years, thus showing it to have been a fixed policy of the people in that portion of the State now constituting West Virginia to participate in, support and carry out this general plan of internal improvements in the State.

" (4.) The development of this system of public improvements thus entered upon was, from its character and extent, necessarily progressive, and the same extended with the general growth and increasing needs of the State, and was incomplete, as above stated, in 1861, though a very considerable portion of such improvements had, prior to that time, been

constructed as above stated, in the territory now constituting West Virginia, in order to meet the needs of the people of that portion of the State for their local purposes. As early as the year 1816 a Board of Public Works was created by law for the State, the members of which were elected by the voters of the State at large, and this Board had in charge the construction and supervision of all the works of public improvement in this State. The annual reports of this Board will be referred to for information as to the character, extent, cost and location of the public works and internal improvements constructed in the State prior to January 1st, 1861. The amounts expended upon the construction of these works in what is now West Virginia can only be accurately ascertained by a examination of the numerous entries in the records of this Board extending through a number of years and showing such expenditures as made from time to time.

"(5.) On the 17th of April, 1861, the people of Virginia, in general convention assembled, adopted an ordinance by which it was intended to withdraw Virginia from the union of the States. From this action a considerable portion of the people of Virginia dissented, and organized a separate government which was known and recognized by the government of the United States as the 'Restored State of Virginia,' and will be hereafter referred to in this bill as the 'Restored State.'

"(6.) On the 20th day of August, 1861, the 'Restored State of Virginia,' in convention assembled, in the city of Wheeling, Virginia, adopted an ordinance to 'provide for the formation of a new State out of the portion of the territory of this State;' section 9 of which ordinance was as follows, to-wit:

"'9. The new State shall take upon itself a just proportion of the public debt of the Commonwealth of Virginia, prior to the first day of January, 1861, to be ascertained by charging to it all the state expenditures within the limits thereof, and a just proportion of the ordinary expenses of the state government since any part of said debt was contracted, and deducting therefrom the moneys paid into the Treasury of the

Commonwealth from the counties included within the said new State during said period. All private rights and interests in lands within the proposed State, derived from the laws of Virginia prior to such separation shall remain valid and secure under the laws of the proposed State, and shall be determined by the laws now existing in the State of Virginia.'

"(7.) On the 31st day of December, 1862, an act was passed by the 37th Congress of the United States providing that the new State thus formed in pursuance of the ordinances of the Wheeling convention above referred to, should, upon certain conditions, be admitted into the Union by the name of West Virginia, with a constitution which had theretofore been adopted for the new State by the people thereof, such conditions being that a change should be made in such proposed constitution in regard to the liberation of slaves therein; and it was provided by this act of Congress that whenever the President of the United States should issue his proclamation stating the fact that such change had been made and ratified, thereupon the act admitting the new State into the Union should take effect sixty days after the date of such proclamation. Such proclamation declaring these conditions to have been complied with was duly made by President Lincoln on April 20th, 1863, and West Virginia, in conformity therewith and by the operation of said act of Congress, was admitted into the Union as a State on the 20th day of June, 1863; and thereupon the State of West Virginia became fully organized, and each of its departments of government commenced operation on the date last named.

"(8.) Pending the admission of the State of West Virginia into the Union the General Assembly of the 'Restored State of Virginia' passed February 3, 1863, the following act:

"'That all property, real, personal and mixed, owned by, or appertaining to this State, and being within the boundaries of the proposed State of West Virginia, when the same becomes one of the United States, shall thereupon pass to, and become the property of the State of West Virginia, and without any

other assignment, conveyance or transfer or delivery than is herein contained, and shall include among other things not herein specified all lands, buildings, roads, and other internal improvements or parts thereof, situated within said boundaries, and vested in this State, or in the president and directors of the Literary Fund, or the Board of Public Works thereof, or in any person or persons for the use of this State, to the extent of the interest and estate of this State therein; and shall also include the interest of this State, or of the said president and directors, or of the said Board of Public Works, in any parent bank or branch doing business within said boundaries and all stocks of any other company or corporation, the principal office or place of business whereof is located within said boundaries, standing in the name of this State, or of the said president or directors, or of the said Board of Public Works, or of any person or persons, for the use of this State.

"'That if the appropriations and transfers of property, stocks, and credits provided for by this act, take effect, the State of West Virginia shall duly account for the same in the settlement hereafter to be made with this State, provided that no such property, stocks and credits shall have been obtained since the reorganization of the state government.'"

Complainant charged "that the property which was by the operation of this act appropriated and transferred from the State of Virginia to the State of West Virginia, and which was subsequently received and enjoyed by the State of West Virginia, consisted of a number of items, and the value of it amounted, in the aggregate, to several millions of dollars, the exact amount your oratrix is unable at this time more definitely to ascertain and state. That of the bank stocks alone, which were transferred under the operation of this act, the State of West Virginia realized and received into her treasury from the sale thereof about six hundred thousand dollars; and that no part of the property so received by West Virginia had been obtained by Virginia since April, 1861.

"(9.) And by a further act of the General Assembly of the 'Restored State of Virginia' passed on the next day, February 4th, 1863, it was enacted:

"'1. That the sum of one hundred and fifty thousand dollars be, and is hereby appropriated to the State of West Virginia out of moneys not otherwise appropriated, when the same shall have been formed, organized and admitted as one of the States of the United States.

"'2. That there shall be, and hereby is appropriated to the said State of West Virginia when the same shall become one of the United States, all balances, not otherwise appropriated, that may remain in the treasury, and all moneys not otherwise appropriated, that may come into the treasury up to the time when the said State of West Virginia shall become one of the United States: provided, however, that when the said State of West Virginia shall become one of the United States, it shall be the duty of the auditor of this State, to make a statement of all the moneys that up to that time, have been paid into the treasury from counties located outside of the boundaries of the said State of West Virginia; and also of all moneys that up to the same time, have been expended in such counties, and the unexpended surplus of all such moneys shall remain in the treasury and continue to be the property of this State.'

"And this last named sum of one hundred and fifty thousand dollars together with other sums belonging to the State of Virginia, were turned over to and received or collected by the new State of West Virginia after its formation as aforesaid.

"(10.) The constitution of the State of West Virginia, which became operative and was in force when she was admitted into the Union, contained the following provisions:

"By Section 5 of Article VIII, of said constitution it was provided:

"'5. No debt shall be contracted by this State except to meet casual deficits in the revenue, to redeem a previous

liability to the State, to suppress insurrection, repel invasion or defend the State in time of war,'

. "And by Section 7 of Article VIII it was provided:

"'7. The legislature may, at any time, direct a sale of the stocks owned by the State, in banks and other corporations, but the proceeds of such sale shall be applied to the liquidation of the public debt, and hereafter the State shall not become a stockholder in any bank.'

"And by Section 8 of Article VIII it was provided:

"'8. An equitable proportion of the public debt of the Commonwealth of Virginia prior to the first day of January, 1861, shall be assumed by this State, and the legislature shall ascertain the same as soon as may be practicable and provide for the liquidation thereof by a sinking fund sufficient to pay the accruing interest and redeem the principal within thirty-four years.'

"At the time the constitution containing these provisions was adopted, West Virginia did not owe, and could not have owed, any 'public debt' or 'previous liability,' except for her just, contributive proportion of the public debt of the original State of Virginia, and for the money and property of the original State which had been transferred to and received by her under the acts of the General Assembly of the 'Restored State of Virginia' above set forth. By the provisions of section 8 of Article VIII, above cited, she expressly assumed her equitable proportion of the debt of the original State as it existed prior to the first day of January, 1861. By section 5 of the same Article VIII, above set forth, her constitution forbade the creation of any debt 'except to meet casual deficits in the revenue, to redeem a previous liability of the State,' &c., and there was not and could not have been any such 'previous liability,' except her portion of the debt of the original State, and her liability for the money and property of the original State which had been transferred to and received by her under the acts of the General Assembly of the 'Restored State.' And section 7 of the same article of her constitution, above cited,

authorized a sale of the stocks owned by the State, in banks and other corporations, the proceeds to be applied to the liquidation of the public debt; and she had no such stocks, except those acquired, as above stated, from the original State. This section of her constitution also expressly required the proceeds of such sale to be applied to her public debt, which public debt could only have been her proportion of that of the original State of Virginia, and her liability for the money and property of the original State which had been transferred to her.

"(11.) After the year 1865 and prior to the year 1872 attempts were made at different times by the public authorities of both the Commonwealth of Virginia and the State of West Virginia, respectively, to ascertain their contributive proportions of the common liability resting upon them for the public debt of Virginia, contracted prior to January 1st, 1861; but all such attempts proved ineffectual and vain, and no accounting or settlement of any kind was ever had between the two States in regard to this debt.

"(12.) The efforts looking to a settlement by the concurrent action of the two States having proved abortive, and your oratrix being anxious to adjust the portion of the common debt which it was right that she should assume and pay, upon terms just and equitable alike to the public creditors and to West Virginia, made several efforts to effect such a settlement.

"The first of these was made by the General Assembly which was chosen at the close of the period of 'destruction and reconstruction,' which, following closely upon the period of disastrous war, had inflicted upon her people injuries and losses, the harmful effects of which were then by no means realized.

"The purpose of the representatives of the Commonwealth, then just emerging from conditions which had impoverished her people and paralyzed their productive energies, to assume and pay to the utmost every dollar which her most exacting creditor could demand of her, was expressed in the act of her General Assembly, approved March 30, 1871.

"By the terms of settlement embodied in this act, your oratrix undertook to give her obligations bearing 6% interest for two-thirds of the principal, and for two-thirds of the past due interest, and also for two-thirds of the interest on that accrued interest, which accrued interest to the extent of nearly $8,000,000, had been funded after the war in new bonds of Virginia, thus capitalizing at 6% not only the interest, but interest upon that interest.

"It was soon apparent that Virginia had by this measure assumed a heavier burden than she was able to bear, and so other plans for the settlement of the state debt were attempted by the acts of the General Assembly of the Commonwealth approved March 28, 1879, and February 14, 1882, until at length a final and satisfactory settlement of the portion of the debt of the original State which Virginia should assume and pay was definitely concluded by the act of February 20, 1892. Your oratrix will file copies of each of the acts of her General Assembly herein mentioned as exhibits to this bill, and to be read as part hereof.

"(13.) As further indicating the great burden which your oratrix, notwithstanding the disaster and loss above referred to, has assumed and met on account of the common debt of the undivided State, she shows your honors that, since January 1st, 1861, she has actually paid off, retired and discharged, or assumed and given her new outstanding obligations for the aggregate sum of over seventy-one million dollars, as will more particularly appear from a statement thereof filed as an exhibit herewith and hereinafter referred to as 'Exhibit Number 7.'

"It is proper in this connection to call attention to the fact that, while your oratrix has made this large contribution toward the settlement of the common debt, West Virginia has not paid one dollar thereof; and although in the early years of her history she repeatedly conceded that there was some portion of that debt which should equitably be borne by her, her properly constituted authorities have for a num-

ber of years refused to recognize that any liability whatever rested upon her, on that account, and have declined even to enter into an accounting or to treat with your oratrix in reference thereto.

"It would seem from the above statement that Virginia has already done as much under all the circumstances as she could be fairly expected to do towards paying off the common public debt of the old State. Such was the view and purpose of the General Assembly in the several acts above recited.

"A question may be raised as to whether such was the effect of the language used in the act of March 30, 1871, with respect to the certificates issued thereunder; but the great mass of the creditors entitled to whatever may be due upon the unfunded obligations of the undivided State, have in effect agreed, as will be hereinafter shown, to waive any such question, and to accept the adjudication of this court in this cause against West Virginia in full discharge of all their claims, thus giving that effect to the act of March 30, 1871, which it was the purpose of your oratrix that it should have.

"(14.) By each of the acts for the settlement of her debt above recited, it was provided that the bonds of undivided Virginia so far as not funded in the new obligations given by your oratrix, should be surrendered to and held by your oratrix, who either by the express terms of the settlement provided for by said acts, or as a just and equitable consequence therefrom, received and holds said original bonds so far as unfunded, in trust for the creditor who deposited the same with her, or his assigns; and certificates to this effect were given by your oratrix to each creditor whose old Virginia bond was so surrendered to her.

"Having as an essential part of the contract for the adjustment of the common debt of the original State entered into this fiduciary relation in reference to these bonds, it became her obligation of duty to the creditors who had confided their securities to her keeping, as well as to her own people, whose credit and fair name required that these obliga-

tions of the old State should be fairly and honorably adjusted, to do all in her power to bring about a determination of West Virginia's just liability in respect thereto, and if possible the recognition and settlement of the same by that State.

"Only after exhausting every means of amicable negotiation, and having her overtures to that end repeatedly refused, and as a last resort, has your oratrix been constrained at length reluctantly to apply to this, the only tribunal which can afford relief, for an adjudication and determination of this question, of such vast importance to your oratrix and to all of her people.

"(15.) All of the bonds and obligations and other evidences of the indebtedness of the original State of Virginia outstanding and contracted on January 1, 1861, as stated in paragraph 1 of this bill, except a comparatively insignificant sum, not amounting to one per cent. of the aggregate of those liabilities, have been taken up and are now actually held by your oratrix, and she has the right to call upon West Virginia for a settlement with respect thereto. They are too numerous and involve too great a number of transactions running through many years, for it to be practicable to exhibit them here in detail, but the original bonds and other evidences of indebtedness so paid off or retired and now held by your oratrix, will, when it shall be proper to do so, be exhibited to the master, who shall take the accounts hereinafter prayed for.

"(16.) Of the evidences of indebtedness representing principal and interest of the liabilities of Virginia contracted before her dismemberment, those so paid off or retired by your oratrix and now held by her in her own right, exclusive of the amounts represented by the certificates issued under the funding acts aforesaid, amount in the aggregate, including the interest to be fairly computed thereon to this date, to a very large sum, considerably in excess of $25,000,000, by far the greater part of it being now, of course, on account of the interest computed thereon, at the rate of 6% per annum, the then legal rate in both States.

"For all of these obligations taken up and payments made on account of the common debt, your oratrix has in her own right, a just claim against West Virginia for contribution to the extent of West Virginia's equitable liability therefor.

"(17.) In addition to the above bonds there were outstanding on the first day of January, 1861, certain obligations of the State of Virginia as guarantor upon some of the securities issued by internal improvement companies, which your oratrix was called upon to provide for and settle. They were not comparatively of very large amount, however, and the questions involved in connection therewith can be stated and settled in the account hereinafter prayed for to be taken between the two States; and in such accounts your oratrix will also ask to have included all such items of debit against the State of West Virginia on account of the property and moneys of the original State which were received or appropriated by West Virginia which may not have been specifically or accurately stated herein. These items of accounting between the two States are so numerous and varied and extend throughout a period of so many years' duration that it is impossible from the nature of the case to state all of them in this bill; and the account between the two States can only be taken and settled, and the balance due your oratrix thereon ascertained, under the supervision of a court of equity.

"(18.) Your oratrix charges that the liability of the State of West Virginia, for a just and equitable proportion of the public debt of Virginia, as of the time when the State of West Virginia was created, rests upon the following among many grounds which might be indicated here:

"First. The area of the territory now known as the State of West Virginia formed about one-third of the territory of the Commonwealth of Virginia when this public debt was created, and its population included about one-third of that of the original State at the time of its dismemberment. And the State of West Virginia did, by the acquisition and appropriation of such territory, with the population thereof, assume

therewith liability for a just and equitable proportion of the public debt created prior to the partition of such territory.

"Second. The liability of West Virginia for a just proportion of the public debt of the Commonwealth of Virginia, as it existed prior to the creation and erection of the State of West Virginia, forms part of her very political existence, and is an essential constituent of her fundamental law as shown in the said ordinance adopted at Wheeling on the 20th day of August, 1861, in which the method of ascertaining her liability on account of said debt is prescribed. And this liability is imbedded in the constitution under which she was admitted as a State into the Federal Union, and was one of the conditions under which she was created a State and admitted into the Union.

"Third. The State of West Virginia has further, by the repeated enactments and joint resolution of her legislature, recognized her liability for a just proportion of this debt.

"Fourth. The State of West Virginia has, since her creation as a State, received from the State of Virginia real and personal property, amounting in value to many millions of dollars, and held and enjoyed the same, but upon express condition that she should duly account for the same in a settlement thereafter to be had between her and the Commonwealth of Virginia.

"Fifth. While the transfer of this property, real and personal, and also of certain moneys of the Commonwealth of Virginia, purport to have been made to the State of West Virginia by the act of 'The Restored Government of Virginia,' there were in fact represented in said 'Restored Government' and in the legislature thereof no other people and no other territory than that which then, as now, constitute the State of West Virginia.

"(19.) The General Assembly of Virginia being anxious to effect a settlement of the portion of the common debt of the undivided State which remained unadjusted, and if possible to bring this about with the friendly coöperation and con-

currence of West Virginia, adopted: 'A joint resolution to provide for adjusting with the State of West Virginia the proportion of the public debt of the original State of Virginia proper to be borne by the State of West Virginia, and for the application of whatever may be received from the State of West Virginia to the payment of those found to be entitled to the same,' approved March 6, 1894. A copy of this resolution will be hereinafter shown as an exhibit to this bill, to be read as a part thereof.

"Under this resolution a commission of seven members was appointed for the purpose of carrying into effect the objects expressed therein.

"The efforts made by this commission, acting under the above resolution to bring about a settlement with West Virginia having proved ineffectual, and the overture which the commission, with the active coöperation of the Honorable Charles T. O'Ferral, the then Governor of the Commonwealth, made to the authorities of West Virginia for the purpose of bringing about a friendly adjustment having been declined, the General Assembly of Virginia passed the act approved March 6, 1900, entitled 'An Act to provide for the settlement with West Virginia of the proportion of the public debt of the original State of Virginia proper to be borne by West Virginia, and for the protection of the Commonwealth of Virginia in the premises,' the purpose of which act is sufficiently set forth in its title, and a copy of the act will also be hereinafter shown as one of the exhibits herewith filed.

"(20.) The commission acting under said last mentioned act made most earnest efforts to bring about an amicable adjust ment of the matters hereinbefore set forth with West Virginia, but all of their efforts in that behalf proved ineffectual and unavailing. An application to this honorable court being thus left as the only alternative for Virginia, this suit has been instituted at the request and direction of the said commission, and in strict conformity with the provisions of the said act of March 6, 1900, all of which will be more fully and completely

shown by the report of the said commission dated January 6, 1906, made to the General Assembly of Virginia now in session, a copy of which report and the documents accompanying the same, and referred to therein, will be exhibited as a part of this bill."

" (21)." Enumerates exhibits attached to the bill and prayed to be regarded as part thereof.

" (22.)" The bill prayed: " Forasmuch, therefore, as your oratrix is remediless save in this form and forum, and to the end that the State of West Virginia may be duly served, through her Governor and Attorney-General, with a copy of this bill, your oratrix prays that the said State of West Virginia may be made a party defendant to this bill, and required to answer the same; that all proper accounts may be taken to determine and ascertain the balance due from the State of West Virginia to your oratrix, in her own right and as trustee as aforesaid; that the principles upon which such accounting shall be had may be ascertained and declared, and a true and proper settlement made of the matters and things above recited and set forth; that such accounting be had and settlement made under the supervision and direction of this court by such auditor or master as may by the court be selected and empowered to that end, and that proper and full reports of such accounting and settlement may be made to this court; that the State of West Virginia may be required to produce before such auditor or master, so to be appointed, all such official entries, documents, reports and proceedings as may be among her public records or official files and may tend to show the facts and the true and actual state of accounts growing out of the matters and things above recited and set forth, in order to a full and correct settlement and adjustment of the accounts between the two States; that this court will adjudicate and determine the amount due to your oratrix by the State of West Virginia in the premises; and that all such other and further and general relief be granted unto your oratrix in the premises as the nature of her case may require or to equity may seem meet."

Attached to the bill were the numerous exhibits referred to.

The State of West Virginia demurred and assigned special causes as follows:

"First. That it appears by said bill that there is a misjoinder of parties plaintiff and a misjoinder of causes of action. The said bill is brought by the Commonwealth of Virginia to recover debts alleged to be due to her in her own right from the defendant for property and money alleged to have been transferred and delivered to the defendant under certain acts of the legislature passed in 1863, and also, as trustee for the owners of certain certificates mentioned and described in said bill, to have an accounting to ascertain and declare the amount claimed to be due from the defendant as her just proportion of the public debt of the plaintiff prior to the first day of January, 1861.

"Second. That this court has no jurisdiction of either the parties to or the subject matter of this action, because it appears by the said bill that the matters therein set forth do not constitute, within the meaning of the Constitution of the United States, such a controversy, or such controversies, between the Commonwealth of Virginia and the State of West Virginia as can be heard and determined in this court, and this court has no power to render or enforce any final judgment or decree thereon.

"Third. That it appears by said bill that the plaintiff herein sues as trustee for the benefit of a number of individuals who are the alleged owners of certain certificates in the said bill set forth and described.

"Fourth. That the said bill does not state facts sufficient to entitle the Commonwealth of Virginia to the relief prayed for, or to any relief, either in her own right or as trustee for the owners of the certificates therein set forth and described.

"Fifth. That it does not appear by said bill that the Attorney General has ever been authorized to institute and prosecute this suit in the name of the Commonwealth of Virginia in her own right, but only as trustee for the use and

benefit of the owners of certain certificates mentioned in the act of March 6, 1900, which is referred to and made part of said bill.

"Sixth. That the said bill does not sufficiently and definitely set forth the claims and demands relied upon, but the allegations thereof are so indefinite and uncertain that no proper answer can be made thereto.

"Seventh. That the allegations in the said bill are not sufficient to entitle the plaintiff therein, either in her own right or as trustee, to an account or to a discovery from this defendant.

"Eighth. That the said bill does not contain any prayer for a judgment or decree or any other final relief against this defendant."

Hearing on the demurrer was had March 11, 12, 1907.

*Mr. William A. Anderson,* Attorney General of the State of Virginia, and *Mr. Holmes Conrad,* for complainant:

The definitions of misjoinder under English chancery practice, as well as the practice in this country, show that there is no such vice in the bill, while want of interest by a co-plaintiff in the subject matter is ground of demurrer. Story's Eq. Pl., §§ 231, 232, 508, 509; Mitf. Pl. 160, 161. Plaintiffs who have no common interest, but assert distinct and several claims against one and the same defendant, cannot be joined. Story's Eq. Pl. § 279. On the other hand, where there is a community of interests among co-plaintiffs desiring the same relief against a common defendant, they may be joined. *Ware* v. *Duke of Northumberland,* 2 Anstruther's Rep. 469; *Brickenhoff* v. *Browns,* 6 Johns. Ch. 139, 151, 152.

It is impossible that there can be any misjoinder of parties plaintiff, because there is only one party plaintiff. Virginia, in her corporate capacity, is the only plaintiff in the suit. She does not sue in any representative capacity, though the bill discloses the fact that, by reason of the arrangements which she has made with the great mass of the holders of the

bonds of the old State, she does hold in her possession nearly all of those bonds as a depository, and *quoad* the custody thereof that she holds them in a fiduciary capacity; but she does not sue as trustee, but sues in her own name, for the purpose of obtaining the equitable relief to which the bill shows that she is fairly entitled.

One interest is that she shall be exonerated, at least to the extent of West Virginia's liability therefor, from any obligation to pay the bonds.

To obtain such just exoneration she has invoked the equitable jurisdiction of this court.

West Virginia is justly liable on many grounds for a just proportion of the public debt of her parent State, Virginia; West Virginia has not only repudiated and openly disavowed all such liability, but she has appropriated to her own use a large amount in value of the public property of Virginia, which Virginia might properly have applied as part of her public assets, to the payment of her public debt; and now, when by this bill in equity Virginia calls on West Virginia to account for the property which she has appropriated and applied to her own uses, and to come in before this court and have her proportion of the public debt ascertained, West Virginia, by her demurrer, protests that the part of the public debt which she owes and the part of the public assets which she has appropriated to her own use are two subjects of complaint so distinct and unconnected as should relieve her from making answer to the bill. This case is entirely different from *New York* v. *Louisiana* and *New Hampshire* v. *Louisiana,* 108 U. S. 78, where neither State had any direct or personal interest in the bonds of Louisiana or in the subject matters of controversy in those suits, but were mere volunteers, self-constituted trustees, without sustaining any relation, or interest, or obligation, or liability in regard to the bonds, or to any question presented in those causes.

While it may be true that, as to the custody of some of these unsatisfied bonds, Virginia sustains the relation of

trustee, she has an enormous interest as to those bonds—an interest as substantial and as real, if not in fact as great, as if she had actually paid these bonds in full.

The ground of demurrer that this court has no jurisdiction of either the parties to or the subject matter of this action, because the matters therein set forth do not constitute, within the meaning of the Constitution of the United States, such a controversy as can be heard and determined in this court, and this court has no power to render or enforce any final judgment or decree thereon, is untenable. *Chisholm* v. *Georgia*, 2 Dall. 419; *Hans* v. *Louisana*, 134 U. S. 1; *Cohens* v. *Virginia*, 6 Wheat. 364, 375, 440; *Kansas* v. *Colorado*, 185 U. S. 125; *Missouri* v. *Illinois*, 180 U. S. 240.

This question has been directly passed upon by this court and its jurisdiction over controversies arising upon pecuniary demands has been sustained in *Georgia* v. *Brailsford*, 2 Dall. 402; *Texas* v. *White*, 7 Wall. 700; *Florida* v. *Anderson*, 91 U. S. 667; *Alabama* v. *Burr et al.*, 115 U. S. 413; and even more emphatically and conclusively in *United States* v. *North Carolina*, 136 U. S. 211; *United States* v. *Texas*, 143 U. S. 621; and *United States* v. *Michigan*, 190 U. S. 379, 396, 406.

*Mr. John G. Carlisle* and *Mr. Charles E. Hogg*, with whom *Mr. C. W. May*, Attorney General of the State of West Virginia, *Mr. W. Mollohan*, *Mr. George W. McClintic* and *Mr. W. G. Mathews* were on the brief, for defendant:

To create a controversy between two States, it seems to us that there must be an assertion of a substantial right of one State as such which is denied or repudiated by the other, and which relates to the interests of each as States, and that the determination of the isssue thus raised will promote or secure some substantial right of the one or the other of these States as States. *New Jersey* v. *New York*, 5 Pet. 285; *Rhode Island* v. *Massachusetts*, 12 Pet. 657; *Florida* v. *Georgia*, 11 How. 293; *Virginia* v. *West Virginia*, 11 Wall. 39, were cases in equity and all involved state boundaries. *Pennsylvania* v. *Wheeling*

*Bridge Company,* 9 How. 657; *S. C.,* 11 How. 528; *S. C.,* 13 How. 518; *S. C.,* 18 How. 429, was a case in equity involving the free and unobstructed navigation of the Ohio River which caused a special damage to the plaintiff State for which there was no adequate remedy at law.

The Commonwealth of Virginia has no such interest in the subject matter of litigation or in the result thereof, so far as the deferred certificates are concerned, as to give her any standing in a court of equity in relation thereto.

The right of Virginia to maintain a suit as sole plaintiff therein, must be determined by the well settled rules of equity practice as recognized and enforced by the English Court of Chancery, and as understood and applied by this court.

Virginia has no interest in these certificates, nor can her interests be in any manner affected by a decree in relation to these certificates.

If she has any connection with this part of the suit it is as its mere promoter, by virtue of her promise to the holders of the certificates—an agent for them—only an instrumentality for the institution of this suit.

This is not such interest as to support a suit in equity. The plaintiff's interest must be as substantial and certain as that of the defendant. *Smith* v. *Hollenbeck,* 46 Illinois, 252; *Smith* v. *Brittenham,* 109 Illinois, 540; *Ashby* v. *Ashby,* 39 La. Ann. 105; *S. C.,* 1 So. Rep. 282; *Field* v. *Maghee,* 5 Paige, 539; *Rogers* v. *Traders' Ins. Co.,* 6 Paige, 583; *Sedgwick* v. *Cleveland,* 7 Paige, 267.

The real owners of the deferred certificates have such a substantial interest and right of ownership therein as to make them indispensable parties, whose presence would oust the court of its jurisdiction.

The practice in this court in cases in equity is regulated by the former practice of the courts of chancery in England. And in cases of original jurisdiction it will frame its proceedings according to those which had been adopted in the English courts in analogous cases, and follow the general rules

of those courts in conducting a cause to a finality. *California* v. *Southern Pacific Railroad,* 157 U. S. 229, 249.

The only instance wherein the court will deviate from or refuse to follow this practice is when it impairs the case by unnecessary technicalities, or defeats the purpose of justice. *California* v. *Southern Pacific Ry. Co., supra;* citing *Florida* v. *Georgia,* 17 How. 478; *Caldwell* v. *Taggart,* 4 Pet. 190; *Barney* v. *Baltimore,* 6 Wall. 280.

In the case before the court the holders of the deferred certificates, who own both the legal and equitable title thereto, are not made parties. The only plaintiff seeking relief is the State of Virginia, who has brought the suit in her own name without any title to this part of the subject matter of the suit, and without any direct or substantial interest in the result thereof. The purpose of this suit is to settle the liability of West Virginia on these deferred certificates to the owners and holders thereof, and any decree which is rendered in this case must relate solely to their rights. The court cannot enter any decree with reference to these certificates which must not necessarily affect the interests of these outstanding owners and holders, who are not before the court either as plaintiffs or defendants.

The purpose of the bill is not only to fix a liability on the State of West Virginia for the payment of these certificates, but also for an accounting to determine the extent of this liability. So it is clearly and at once perceivable that the holders of these certificates are vitally interested as to both of these purposes of the suit.

The fact that the commissioners of the Sinking Fund and Literary Fund of Virginia have in their possession comparatively small portions of the said certificates issued by the plaintiff does not give the plaintiff any cause of action against the defendant.

The plaintiff cannot assert the claim which she sets forth in her bill in a court of equity.

The prosecution of this suit by Virginia is solely in the

interests of the owners and holders of the deferred certificates issued by Virginia herself without recourse upon her, and set apart as a liability of West Virginia to the holders of the old obligations, which have been surrendered to the State of Virginia and by her cancelled in accordance with her own acts of legislation.

She therefore cannot come into a court of equity to assert a right of contribution against West Virginia; the decree which she seeks to obtain cannot inure to her benefit, but only to that of the holders of the deferred certificates; she must have paid everything for which she and the new State were jointly liable so as to relieve the new State from all liability before she can seek contribution from her joint obligor.

That this is the principle upon which rests the equitable right of contribution is the recognized and well settled doctrine of the courts. *Springer* v. *Foster*, 21 Ind. App. 15; *S. C.*, 60 N. E. Rep. 720; *Kirkpatrick* v. *Murphy*, 3 N. J. Law, 506; *Grove* v. *O'Brien*, 1 Maryland, 438; *Rooker* v. *Benson*, 83 Indiana, 250, 256; *Zook* v. *Clemmer*, 44 Indiana, 15; *Pegram* v. *Riley*, 88 Alabama, 399; *S. C.*, 6 So. Rep. 753; *Screven* v. *Joiner*, 1 Hill Ch. 252; *S. C.*, 26 Am. Dec. 199.

The party seeking contribution must have paid more than his share in order to maintain a suit for contribution. 9 Cyc. 699; 3 Am. & Eng. Dec. in Eq. 163.

The demand made by Virginia which she claims arises out of the acts of her General Assembly, passed February 3d and 4th, respectively, in the year 1863, whereby she transferred certain real and personal property belonging to her to be used by the new State when created and organized, if it has any validity, which is not conceded here, is purely a legal demand and one which cannot be asserted under any circumstances in a court of equity.

If it be an equitable demand, upon what principle or doctrine of equity does it rest? It is not secured by any lien; it is not in the nature of a trust; it rests upon no equities to be asserted in order to enter a decree or to make the claim

available. It is simply a money demand for the value of property which the plaintiff claims was used and appropriated by the defendant for which payment should be made.

In the Federal courts the right of trial by jury under the Seventh Amendment cannot be dispensed with except by the assent of the parties entitled to it, nor can it be impaired by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action or during its pendency. Such aid in the Federal courts must be sought in separate proceedings, to the end that the right to a trial by jury in a legal action may be preserved intact. *Scott* v. *Neely*, 140 U. S. 106, 117.

This court has no jurisdiction to settle or determine the principle upon which West Virginia shall be made liable for any portion of the old debt of Virginia, because this was matter of contract between Virginia and West Virginia upon the admission of the latter into the Union.

When West Virginia framed her constitution and inserted in it the provision concerning the public debt of Virginia created prior to 1861, and the State of Virginia through her legislature accepted the constitution of West Virginia as the basis of her consent, this created a compact between the two States and was absolutely binding both upon Virginia and West Virginia.

By this compact between Virginia and West Virginia, the former State referred to the legislature of the latter the matter of ascertaining "an equitable proportion of the public debt of the Commonwealth of Virginia prior to the first day of January, 1861," and therefore this "proportion" cannot be otherwise ascertained or determined than by the consent of the State of West Virginia; nor can its liquidation be otherwise provided for than by a sinking fund sufficient in amount to pay the accruing interest, and redeem the principal of whatever sum may thus be ascertained as the equitable proportion that West Virginia agreed to assume. Virginia referred this matter absolutely to the judgment of the legislature of West

Virginia and tacitly agreed to abide by the action of this legislative body.

This stipulation or compact between Virginia and West Virginia, with reference to the public debt of the former, is a valid and binding contract, and Virginia can do nothing, either by legislation or otherwise, to impair its obligation. West Virginia has the undoubted moral and legal right to stand upon its terms; and if in the exercise of its judgment exercised upon a basis just and equitable, it should be ascertained by the legislature of West Virginia that the State owes nothing to the bondholders of the old debt of Virginia, then there is no obligation whatever subsisting which can be enforced by the holders of any part of the old debt of Virginia, and especially has Virginia herself no cause of action against this State.

Mr. CHIEF JUSTICE FULLER, after making the foregoing statement, delivered the opinion of the court.

The State of West Virginia was admitted into the Union June 20, 1863, under the proclamation of the President of the United States of April 20, 1863, in pursuance of the act of Congress approved December 31, 1862, upon the terms and conditions prescribed by the Commonwealth of Virginia in ordinances adopted in convention and in acts passed by the General Assembly of the "Restored Government of the Commonwealth," giving her consent to the formation of a new State out of her territory, with a constitution adopted for the new State by the people thereof. The ninth section of the ordinance adopted by the people of the "Restored State of Virginia" in convention assembled in the city of Wheeling, Virginia, on August 20, 1861, entitled "An ordinance to provide for the formation of a new State out of a portion of the territory of this State," provided as follows:

"9. The new State shall take upon itself a just proportion of the public debt of the Commonwealth of Virginia, prior to

the first day of January, 1861, to be ascertained by charging to it all state expenditures within the limits thereof, and a just proportion of the ordinary expenses of the state government, since any part of said debt was contracted; and deducting therefrom the monies paid into the treasury of the Commonwealth from the counties included within the said new State during the same period. All private rights and interests in lands within the proposed State, derived from the laws of Virginia prior to such separation, shall remain valid and secure under the laws of the proposed State, and shall be determined by the laws now existing in the State of Virginia. . . ."

The consent of the Commonwealth of Virginia was given to the formation of a new State on this condition. February 3 and 4, 1863, the General Assembly of the "Restored State of Virginia" enacted two statutes in pursuance of the provisions of which money and property amounting to and of the value of several millions of dollars were, after the admission of the new State, paid over and transferred to West Virginia. The constitution of the State of West Virginia when admitted contained these provisions, being sections 5, 7 and 8 of Article VIII thereof, as follows:

"5. No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion, or defend the State in time of war."

"7. The legislature may at any time direct a sale of the stocks owned by the State in banks and other corporations, but the proceeds of such sale shall be applied to the liquidation of the public debt; and hereafter the State shall not become a stockholder in any bank. . . ."

"8. An equitable proportion of the public debt of the Commonwealth of Virginia, prior to the first day of January, in the year one thousand eight hundred and sixty-one, shall be assumed by this State; and the legislature shall ascertain the same as soon as may be practicable, and provide for the liquidation thereof, by a sinking fund sufficient to pay the accru-

ing interest, and redeem the principal within thirty-four years."

The "public debt" and the "previous liability" manifestly referred to a portion of the public debt of the original State of Virginia and liability for the money and property of the original State, which had been received by West Virginia under the acts of the General Assembly above cited, enacted while the territory and people afterwards forming the State of West Virginia constituted a part of the Commonwealth of Virginia, though one may be involved in the other; while the provisions of sections 7 and 8 were obviously framed in compliance with the conditions on which the consent of Virginia was given to the creation of the State of West Virginia, and the money and property were transferred. From 1865 to 1905 various efforts were made by Virginia through its constituted authorities to effect an adjustment and settlement with West Virginia for an equitable proportion of the public debt of the undivided State, proper to be borne and paid by West Virginia, but all these efforts proved unavailing, and it is charged that West Virginia refused or failed to take any action or do anything for the purpose of bringing about a settlement or adjustment with Virginia.

The original jurisdiction of this court was, therefore, invoked by Virginia to procure a decree for an accounting as between the two States, and, in order to a full and correct adjustment of the accounts, the adjudication and determination of the amount due Virginia by West Virginia in the premises.

But it is objected that this court has no jurisdiction because the matters set forth in the bill do not constitute such a controversy or such controversies as can be heard and determined in this court, and because the court has no power to enforce and therefore none to render any final judgment or decree herein. We think these objections are disposed of by many decisions of this court. *Cohens* v. *Virginia*, 6 Wheat. 264, 378, 406; *Kansas* v. *Colorado*, 185 U. S. 125; *Kansas* v. *Colorado*, May 13, 1907, *ante*, p. 46; *Missouri* v. *Illinois*, 180 U. S. 208; *S. C.*, 200 U. S. 496; *Georgia* v. *Copper Company*, May 13,

1907, *ante,* p. 230; *United States* v. *Texas,* 143 U. S. 621; *United States* v. *North Carolina,* 136 U. S. 211; *United States* v. *Michigan,* 190 U. S. 379.

In *Cohens* v. *Virginia,* the Chief Justice said: "In the second class, the jurisdiction depends entirely on the character of the parties. In this are comprehended 'controversies between two or more States, between a State and citizens of another State,' 'and between a State and foreign States, citizens or subjects.' If these be the parties, it is entirely unimportant what may be the subject of controversy. Be it what it may, these parties have a constitutional right to come into the courts of the Union."

And, referring to the Eleventh Amendment, it was further said:

"It is a part of our history, that, at the adoption of the Constitution, all the States were greatly indebted; and the apprehension that these debts might be prosecuted in the Federal courts formed a very serious objection to that instrument. Suits were instituted; and the court maintained its jurisdiction. The alarm was general; and, to quiet the apprehensions that were so extensively entertained, this amendment was proposed in Congress, and adopted by the state legislatures. That its motive was not to maintain the sovereignty of a State from the degradation supposed to attend a compulsory appearance before the tribunal of the Nation, may be inferred from the terms of the amendment. It does not comprehend controversies between two or more States, or between a State and a foreign State. The jurisdiction of the court still extends to these cases; and in these a State may still be sued. We must ascribe the amendment, then, to some other cause than the dignity of a State. There is no difficulty in finding this cause. Those who were inhibited from commencing a suit against a State, or from prosecuting one which might be commenced before the adoption of the amendment, were persons who might probably be its creditors. There was not much reason to fear that foreign or sister States would

be creditors to any considerable amount, and there was reason to retain the jurisdiction of the court in those cases, because it might be essential to the preservation of peace. The amendment, therefore, extended to suits commenced or prosecuted by individuals, but not to those brought by States."

By the cases cited, and there are many more, it is established that, in the exercise of original jurisdiction as between States, this court necessarily in such a. case as this has jurisdiction.

*United States* v. *North Carolina* and *United States* v. *Michigan, supra,* were controversies arising upon pecuniary demands, and jurisdiction was exercised in those cases just as in those for the prevention of the flow· of polluted water from one State along the borders of another State, or of the diminution in the natural flow of rivers by the State in which they have their sources through and across another State or States, or of the discharge of noxious gases from works in one State over the territory of-another.

The object of the suit is a settlement with West Virginia, and to that end a determination and adjudication of the amount due by that State to Virginia, and when this court has ascertained and adjudged the proportion of the debt of the original State which it would be equitable for West Virginia to pay, it is not to be presumed on demurrer that West Virginia would refuse to carry out the decree of this court. If such repudiation should be absolutely asserted we can then consider by what means the decree may be enforced. Consent to be sued was given when West Virginia was admitted into the Union, and it must be assumed that the legislature of West Virginia would in the natural course make provision for the satisfaction of any decree that may be rendered.

It is, however, further insisted that this court cannot proceed to judgment because of an alleged compact entered into between Virginia and West Virginia, with the consent of Congress, by which the question of the liability of West Virginia to Virginia was submitted to the arbitrament and award

of the legislature of West Virginia as the sole tribunal which could pass upon it. As we have seen, the constitution of West Virginia when admitted into the Union contained the provision: "An equitable proportion of the public debt of the Commonwealth of Virginia prior to the first day of January, one thousand eight hundred and sixty-one, shall be assumed by this State, and the legislature shall ascertain the same as soon as may be practicable and provide for the liquidation of the same by a sinking fund and redeem the principal within thirty-four years." And it is said that, on May 13, 1862, the legislature of Virginia passed an act entitled "An act giving the consent of the Legislature of Virginia to the formation and erection of a new State within the jurisdiction of this State," by which consent was given to the creation of the proposed new State, "according to the boundaries and under the provisions set forth in the Constitution for the said State of West Virginia, and the schedule thereto annexed, proposed by the convention which assembled at Wheeling on the twenty-sixth day of November, 1861;" and that by the act of Congress the consent of that body was given to all those provisions which thus became a constitutional and legal compact between the two States. The act of May 13, 1862, was not made a part of the case stated in the bill, and its validity is denied by counsel for Virginia, but it is unnecessary to go into that, for when Virginia, on August 20, 1861, by ordinance provided "for the formation of a new State out of the territory of this State," and declared therein that "the new State shall take upon itself a just proportion of the public debt of the Commonwealth of Virginia prior to the first day of January, 1861," to be ascertained as provided, it is to be supposed that the new State had this in mind when it framed its own constitution, and that when that instrument provided that its legislature should "ascertain the same as soon as practicable," it referred to the method of ascertainment prescribed by the Virginia convention. Reading the Virginia ordinance and the West Virginia constitutional provision *in pari materia*, it follows

that what was meant by the expression that the "legislature shall ascertain" was that the legislature should ascertain as soon as practicable the result of the pursuit of the method prescribed, and provide for the liquidation of the amount so ascertained. And it may well be inquired why, in the forty-three years that have elapsed since the alleged compact was entered into, West Virginia has never indicated that she stood upon such a compact, and, if so, why no step has ever been taken by West Virginia to enter upon the performance of the duty which such "compact" imposed, and to notify Virginia that she was ready and willing to discharge such duty.

. It is also urged that Virginia had no interest in the subject matter of the controversy because she had been released from all liability on account of the public debt of the old Commonwealth, evidenced by her bonds outstanding on the first day of January, 1861. This relates to the acts of the General Assembly of Virginia of March 30, 1871, March 28, 1879, February 14, 1882, February 20, 1892, March 6, 1894, and March 6, 1900. According to the bill, Virginia by the act of March 30, 1871, and subsequent acts, in an attempt to provide for the funding and payment of the public debt, having estimated that the liability of West Virginia was for one-third of the amount of the old bonds, provided for the issue of new bonds to the amount of two-thirds of the total, and for the issue of certificates for the other third, which showed that Virginia held the old bonds so far as unfunded in trust for the holders or their assignees to be paid by the funds expected to be obtained from West Virginia as her "just and equitable proportion of the public debt." The legislation resulted in the surrender of most of the old bonds to Virginia, satisfied as to two-thirds, and held as security for the creditors as to one-third. We do not care to take up and discuss this legislation. We are satisfied that as we have jurisdiction, these questions ought not to be passed upon on demurrer. _Kansas_ v. _Colorado_, 185 U. S. 125, 144, 145. And this also furnishes sufficient ground for not considering at length the objection of multi-

fariousness. The observations of Lord Cottenham, in *Campbell* v. *Mackay,* 1 Mylne & Craig, 603, that it is impracticable to lay down any rule as to what constitutes multifariousness, as an abstract proposition; that each case must depend upon its own circumstances; and much must be left where the authorities leave it, to the sound discretion of the court, have been often affirmed in this court. *Oliver* v. *Piatt,* 3 How. 333, 411; *Gaines* v. *Relf,* 2 How. 619, 642. But we do not mean to rule that the bill is multifarious. It is true that the prayer contains, among other things, the request, "that all proper accounts may be taken to determine and ascertain the balance due from the State of West Virginia to your oratrix in her own right and as trustee aforesaid," but it also prays that the court "will adjudicate and determine the amount due to your oratrix by the State of West Virginia in the premises." And we understand the reference to holding in trust to be in the interest of mere convenience, and that the bill cannot properly be regarded as seeking in chief anything more than a decree for "an equitable proportion of the public debt of the Commonwealth of Virginia on the first day of January, 1861." The objections of misjoinder of parties and misjoinder of causes of action may be treated as resting on matter of surplusage merely, and at all events further consideration thereof may wisely be postponed to final hearing. *Florida* v. *Georgia,* 17 How. 491, 492; *California* v. *Southern Pacific Company,* 157 U. S. 249.

The order will be—

*Demurrer overruled without prejudice to any question, and leave to answer by the first Monday of next term.*