In the Matter of the Application for the Construction of the Will of JOHN B. MANNING, Deceased.

AGNES MANNING BANON, Appellant; ROBERT M. McKEON and Others, Respondents.

First Department, February 4, 1921.

Wills — " West Virgina State bonds," as used by testator, construed.

Prior to the separation from the State of Virginia during the War of the Rebellion of the inhabitants of approximately one-third of the territory of said State and the creation from such territory of the State of West Virginia, the State of Virginia had issued certain bonds which were then outstanding.   After the war, the Legislature of the State of Virginia determined that the proportion of the bonds outstanding at the time of the separation fairly and justly chargeable to Virginia was two-thirds and that the other one-third was fairly and justly chargeable to West Virginia. Under a statute of the State of Virginia the holders of the old outstanding bonds were permitted to deliver them to the treasurer of the State in trust

and to receive from said State its own bonds for two-thirds of the amount and certificates for the remaining one-third, showing that they were deemed to be the proportion of the obligations which the State of West Virginia should pay, and a firm of New York bankers was designated as a depository to receive the old bonds.

The provision of a will by which the testator gave to his daughter the "West Virginia State bonds" construed and *held,* that said daughter takes all of the certificates, both for principal and interest, issued by the State of Virginia representing West Virginia's *pro rata* liability, and the certificates issued by the designated depository therefor which the testator held at the time of his death.

APPEAL by Agnes Manning Banon from a decree of the Surrogate's Court of the county of New York, entered in said surrogate's office on the 2d day of July, 1919, in so far as it construes paragraph 32 of the will of the testator as limiting the legacy thereby given to her to " State of Virginia interest scrip certificates or Brown Brothers certificates issued for State of Virginia interest scrip certificates," owned by the testator at the time of his death, and holds that the Brown Brothers certificates for the State of Virginia certificates for *principal* owned by the testator at the time of his death form a part of the residuary estate.

*Herman Aaron* of counsel [*Parker & Aaron,* attorneys], for the appellant.

*Ellis L. Aldrich,* for the respondents Joseph B. Meade and Anna M. Starke, as executors.

*Daniel J. Mooney,* special guardian for the respondents Robert Manning McKeon and Daniel Manning McKeon.

*Eliot Tuckerman,* special guardian for the respondent Rita Manning.

LAUGHLIN, J.:

This is a proceeding by the executors for the construction of the will of John B. Manning. The will was duly executed on the 16th day of May, 1914, and the testator died on the 23d of April, 1918, and his will was duly admitted to probate on the 24th day of May, 1918. The point on which the executors were desirous of having the will construed arose under paragraph 32 thereof, which is as follows:

" *Thirty-two.* It is further my wish that my Executors turn

over to my daughter Agnes Manning Banon, the West Virginia State Bonds, North Carolina and South Carolina State Bonds which my estate now holds. I desire my daughter Agnes to have such bonds for the reason that she has taken such an active interest in said bonds, which are of very little value at the present time but may improve on her hands in a few years."

The precise point for construction is with respect to what securities are referred to as "West Virginia State Bonds." The testator when he made the will and at the time of his death owned certain North Carolina and South Carolina State bonds, which were of no value. It appears that he owned no bonds of the State of West Virginia and that no bonds had ever been issued by that State. During the War of the Rebellion the inhabitants of approximately one-third of the territory of the State of Virginia held a convention at Wheeling and on the 19th day of June, 1861, restored and reorganized the government of the State of Virginia, and on the 20th day of August, 1861, adopted "An Ordinance to provide for the formation of a new State out of a portion of the territory of this State," and thereafter assembled in convention on the 26th day of November, 1861, framed and subsequently adopted a Constitution which as amended was ratified by the Congress of the United States on December 31, 1862, and thereby with the consent of the recognized legislative authority of the State of Virginia and pursuant to a proclamation of President Lincoln the separated territory became one of the States of the Union and known as the State of West Virginia. (See 12 U. S. Stat. at Large, 633, chap. 6; 13 id. 731, Proc. No. 3; Ordinances of Wheeling Convention of June 11, 1861, pp. 5–7, 16–19; Lewis on How West Virginia Was Made, pp. 284, 296, 317 *et seq.;* 7 Thorpe's Am. Charters, etc., 4011 *et seq.*) Prior to the separation the State of Virginia had issued certain bonds which were then outstanding. The State of West Virginia had agreed by the ordinance authorizing the organization of that State to take upon itself a just proportion of the public debt of the Commonwealth of Virginia prior to the 1st day of January, 1861. After the war the State of Virginia undertook to make a settlement with the bondholders. Beginning in 1871 certain acts were passed by the Legislature of Virginia

to that end. The Legislature determined that the proportion of the bonds outstanding at the time of the separation or dismemberment fairly and justly chargeable to Virginia was two-thirds, and that the other one-third was fairly and justly chargeable to West Virginia. On that basis the State of Virginia made a settlement with the holders of the bonds. On the surrender of the outstanding bonds to be held in trust pending an adjustment with the State of West Virginia, the State of Virginia, as then constituted, issued new bonds to the holders to the extent of two-thirds of the old bonds and undertook the collection for their benefit of the remaining one-third from West Virginia. Under a statute of the State of Virginia, the holders of the old outstanding bonds were permitted to deliver them to the Treasurer of the State of Virginia in trust as aforesaid, and in return were to receive from the State of Virginia its own bonds for two-thirds of the amount and certificates for the remaining one-third, showing that they were deemed to be the proportion of the obligations which the State of West Virginia should pay. For the convenience of the bondholders and under an agreement with them, Brown Brothers & Co., a firm of New York bankers, acted as a depositary or committee to receive the old bonds and transmit them to the Treasurer of Virginia, issuing its own negotiable certificates therefor and receiving the certificates issued by that State and holding the same in trust for the bondholders. The point presented for decision relates only to the certificates issued by the State of Virginia for the one-third part of the indebtedness which it deemed justly and equitably a charge against West Virginia, and to certificates for accrued interest with respect to that part of such indebtedness. The first issue of such certificates was under an act of the General Assembly of Virginia in 1871 known as chapter 282. (Va. Acts of 1870–71, p. 378, chap. 282.) Evidently all of the outstanding bonds were not surrendered under that act, for there were other series of such certificates issued by the State of Virginia pursuant to laws enacted in 1879, 1882 and 1892. (Va. Acts of 1878–79, p. 264, Sp. Sess. chap. 24; Va. Acts of 1881–82, p. 88, chap. 84; Va. Acts of 1891–92, p. 533, chap. 325.) The certificates for said one-third of the principal issued by the State of Virginia

pursuant to the act of 1871 bore the heading: " Commonwealth of Virginia." They certified that there was due to the holder a specified amount, being one-third of the amount of the bonds surrendered by him, and that payment thereof with interest at the rate of six per cent per annum would be provided for in accordance with such settlement as should thereafter be made between the States of Virginia and West Virginia in regard to the public debt of the State of Virginia existing at the time of its dismemberment, and that the State of Virginia held the surrendered bonds, in so far as it had not issued its own bonds therefor, in trust for the holder of the certificate or his assigns. The certificates issued under the act of 1879 bore the heading: " West Virginia Certificate Commonwealth of Virginia." Those certificates were the same with respect to interest and the other provisions as those issued under the act of 1871, and contained a further provision by which the State of Virginia agreed to negotiate or aid the holders of such certificates under that or previous acts in negotiating with the State of West Virginia for an amicable settlement of the claims of such holders; and provided that the acceptance of the certificate " for West Virginia one-third " issued under the act should be taken and held as a full and absolute release of the State of Virginia from all liability on account of the certificate. The certificates issued under the act of 1882 bore the same heading as those issued under the act of 1879 but they provided that the Commonwealth of Virginia had discharged her equitable share of the old bonds, leaving a specified balance payable to the bearer of the certificate to be accounted for by the State of West Virginia without recourse to the State of Virginia and should bear interest only at the rate of five per cent. The certificates issued under the act of 1892 bore the same heading as those issued under the acts of 1879 and 1882 and were to the same effect as those issued under the act of 1882 with the exception that they provided for six per cent interest. The certificates issued under the act of 1871 were bought and sold on the New York Stock Exchange, and the others were bought and sold elsewhere in New York city. The testator was a broker and speculator and traded in these certificates to a considerable extent; and at the time he made the will he held Brown Brothers' certificates therefor to the

extent of $185,855.90 par value, embracing some of each series, and in addition thereto he held some of the original certificates of each series, the par value of which is not shown, for which Brown Brothers had not issued certificates. At the time of his death he held only Brown Brothers' certificates representing certificates which it held for him of the par value of $425,147.08 embracing some of each series. The fact was not expressly shown, but it is fairly to be inferred from the evidence, that the four series of certificates to which reference has been made were issued for one-third of the *principal only* of the old bonds and did not cover the accrued interest thereon, for it was expressly shown that under the acts of 1879, 1882 and 1892 the State of Virginia at the same time that it issued certificates for one-third of the principal of the old bonds issued separate certificates for one-third of the accrued interest, and the testimony was given in such form that it indicates that the same course was pursued under all of the acts, although the act of 1871 was not expressly enumerated in the question which the witness answered in the affirmative to that effect. It appears that all of the interest certificates were in the same form and one of them was introduced in evidence to show the form. It is Exhibit 11 and is as follows:

" TREASURERS OFFICE

" $147.                    RICHMOND, VA., *Dec.* 10, 1894.

" Register No. 172          ·  .         Transaction No. 278

" This is to certify
" that the
" COMMONWEALTH OF VIRGINIA

has this day discharged her equitable share of unfunded interest presented for funding under the provisions of the Act of the General Assembly of Virginia approved February 20th, 1892, leaving a balance due to Bearer of One Hundred and forty Seven 00/100 Dollars bearing no interest to be accounted for by the State of West Virginia without recourse upon this Commonwealth.

" JOSIAH RYLAND, JR.,
" A. W. HANNAN, JR.,                    *Second Auditor.*
" *Treasurer.*"

It appears that the certificates representing the principal issued under the acts of 1879, 1882 and 1892 and the cer-

tificates representing interest issued under the various acts were not dealt in on the New York Stock Exchange, but they were all bought and sold to a considerable extent in the city of New York and the testator traded in the interest certificates as well as the certificates for principal.   Brown Brothers & Co. also received for the bondholders under the agreement between it and them the interest certificates to which they were entitled on the surrender of · their bonds and issued to them like negotiable certificates therefor.   When the testator died, he held in all seventy-eight certificates issued to him by Brown Brothers, embracing certificates for principal and certificates for interest and they were all contained in the same envelope.   There was pasted upon the front of the envelope a typewritten statement showing under the general heading " Virginia Deferred," a list of certificates bearing the subheading " Original," which was followed by another list bearing the subheading " Brown Brothers " containing a reference to acts of 1871, 1879 and 1882 with a specified amount, preceded by the dollar sign, on the same line, with the total amount added, showing $185,402.77; and this was followed by another list under the subheading " Brown Brothers Int. Ctfs," under which there is a reference to the four acts and on the same line specified amounts, which amounts were totaled, aggregating $65,084.66.   It appears that this did not correctly represent the amount of the different securities in the envelope when he died.   At the time of his death there were in the envelope seventy-eight certificates issued by Brown Brothers and they were introduced in evidence.   In the digest of these certificates given in the record it is stated that they were all in the *same form* with the exception of the specification of numbers, amounts, dates of issue, and under what act issued.   One, only, of them is printed in full.   It bears the heading: " Virginia Debt Certificate, Receipt of Brown Brothers and Company."

It appears to be a certificate for principal issued under the act of 1871.   We are not otherwise informed by the record with respect to the form of the certificates issued by Brown Brothers representing interest certificates held by them, and it is, therefore, at least to be inferred that they all bore the same heading, namely, " Virginia Debt Certificate," and doubtless the certificates recited that they were issued for

interest, as the others recited that they were issued for principal. If the case rested here, it would be perfectly plain, I think, that by " West Virginia State Bonds " in the 32d paragraph of the will, the testator meant all of the certificates issued by the State of Virginia representing the proportion of the indebtedness for which there was a claim only against the State of West Virginia, including certificates both for principal and interest.

It is contended, however, by the respondents that, owing to the manner in which the testator kept his account of these securities, he differentiated between the certificates issued for principal and those issued for interest, and that in view of the fact that in said paragraph of the will he referred to the " West Virginia State Bonds " as being then of but little value, which was only true with respect to the certificates for interest, it is a reasonable inference that he had in mind the interest certificates only. His estimate of the value of the certificates for principal is indicated by entries in his books in 1914 showing valuations of about twenty-one per cent or twenty-two per cent of par. When he made the will he held original and Brown Brothers certificates for principal of the par value of $377,458.81 which he carried on his books at a valuation of $83,040.94, but which, according to the market quotations for the securities nearest in point of time, were worth approximately $203,798.79; and at the time of his death he held certificates of the par value of $425,147.08 for principal, the market value of which was approximately $209,237.01. There was no active market for these securities and it is quite evident that had they been offered for sale in any considerable quantities, the market price would have dropped rapidly. At the time he made the will he owned interest certificates of the par value of $63,762, which he carried on his books as worth $13,390.02, and which were of the market value approximately of $956.43; and when he died his holdings of interest certificates had a par value of $66,135.55 and were worth only about $992.03. These facts are neither controlling nor do they aid us materially. We cannot hold that a man owning such a great fortune, and leaving each of his children as a residuary legatee upwards of $1,000,000, would have devoted an entire paragraph of his will to leaving to the one of them

who took an interest therein and assisted him with respect to
these securities, as he therein states, the interest certificates
only which he deemed worth only about $13,000, and which
were actually worth less than $1,000, or that in distributing
$10,000,000 principally in legacies of $1,000,000 or more, he
may not have looked upon all of these securities which he was
carrying at a valuation of less than $100,000 as of little value
compared with their par value or the valuations with which he
was dealing.  He did not assign the fact that they were then
of little value as the reason he gave the securities to appellant,
but merely mentioned that fact in impliedly advising her to
hold them for a rise in value.  There is nothing sufficiently
definite in the manner in which the testator kept his accounts
of these securities to support that contention.  At first, he
enumerated in a book of accounts the certificates for principal
under the heading " Virginia ' Deferred,' '" and the certificates
for interest under the heading " West Virginia ' Script,' '" in
each instance only the last word being placed in quotation
points; and in the index of the book he classified them in
the same manner.  In carrying over these accounts from
page 53 of his account book to page 388, he placed the same
headings above the certificates for principal but placed the
heading " 63,762.00 W. Va. at 21 " above the certificates for
interest.  The testator carried these accounts over into and
continued them on page 36 of a ledger account with the
heading " Virginia Deferred " for the certificates repre-
senting the principal, and " West Virginia Deferred " for the
certificates representing interest.  This account was continued
on page 142 of the ledger where he enumerated both classes
of securities under the general heading " Virginia Deferred
& West Virginia."  That account contains a subheading
" Coupon Script " followed by another subheading " Brown
Brothers Interest," in which he enumerates interest certificates
under the four acts, which is followed by another subheading
" Brown Brothers Ctfcs," under which he enumerates
certificates which evidently were for principal.  All of the
items in that account are dated December 11, 1916.  In the
index to the ledger he referred to this account as " Va.
and West Va. Dfd."  On page 435 of the ledger, under date
of August 1, 1917, there is an entry summarizing these accounts

and adding thereto the amount of original certificates which he then held, all under the heading "Va. & West Virginia." The evidence shows that the testator followed with deep interest the press reports of negotiations between the two States with respect to the payment of these obligations which ultimately resulted in the State of Virginia filing a bill in equity against the State of West Virginia in the Supreme Court of the United States to compel West Virginia to pay its equitable proportion of the original bond indebtedness outstanding at the time of the secession. The court sustained the bill on demurrer (*Virginia* v. *West Virginia*, 206 U. S. 290) and on the hearing decided that West Virginia was liable but made no decision with respect to the enforcement of the liability. (220 U. S. 1.) It is quite evident that the court deferred action in the hope that the State of West Virginia would voluntarily recognize and adjust its liability, for the court denied two subsequent applications made by Virginia for a final decree providing for the enforcement of the liability. (222 U. S. 17; 231 id. 89.) The last of these decisions was in November, 1913, and that was the status at the time the testator made the will. In June, 1914, West Virginia applied for leave to file a supplemental answer with a view to obtaining a reduction with respect to the amount of the liability, and the court thereupon appointed a master to equitably apportion the liability. (234 U. S. 117.) The court later confirmed the report of the master fixing the liability, but still refrained from providing for its enforcement. (238 U. S. 202.) Virginia then applied for a writ of mandamus to compel the Legislature of West Virginia to levy the necessary tax to pay its proportion of the liability, and West Virginia moved to dismiss the proceeding, but the motion was denied and the cause was set for argument. (246 U. S. 565.) We are informed by counsel that the State of West Virginia thereupon proceeded to and did provide for adjusting its share of the liability as decided by the court. Under the decision of the Supreme Court of the United States, West Virginia was only held liable for a little over one-half the amount of the securities issued by Virginia as payable by West Virginia. It thus appears that the securities now have a substantial value, but, as already observed, that was not known at the time the will was made. It is fairly

to be inferred that the testator knew perfectly well that these securities, although representing in part the original State bonds, were only equitable claims against the State of West Virginia, which it manifested unwillingness to adjust and for the enforcement of which it had not been decided at the time he made the will that there was any remedy. It is evident, therefore, that in keeping his accounts he merely attempted to separate the certificates representing interest from those representing principal, so that he might readily know the amount he held of each for his guidance in dealing with them in the market, as by reducing or increasing the amount of his holdings of the respective classes. There is, in my opinion, no basis for holding that he considered any part of these securities as representing West Virginia State bonds and the rest as not representing such bonds. It must, therefore, I think, be held either that he referred to all of them as West Virginia bonds, or that the provision of the will is too indefinite and uncertain to be given effect. I am of opinion that it is quite clear that he intended that the appellant should take all of these securities. A further contention is made that if it be so held, it will result in an inequality in the distribution of his estate, and that his will, taken as a whole, contemplates an equal distribution of his property between his children and grandchildren. That contention is accurate in so far only as it relates to his residuary estate, which he left to his six children and three grandchildren in equal shares. His estate amounted to some $10,000,000. The provisions requiring a construction are not with respect to any part of the residuary estate but with respect to a legacy; and he did not deal alike with all his children or grandchildren concerning legacies. He gave a coasting vessel to each of his five children with no compensating provision for the sixth; and it does not even appear that the coasting vessels were of equal value. He gave legacies of $50,000 outright to each of three of his children; to two others he merely gave each the use of $25,000 for life; and to another, a son, he gave the use of $50,000 for life with the remainder over to the widow and issue of the son. With respect to the legacies, there was not equality either between his children or between them and his grandchildren.

It follows that the decree in so far as it is appealed from should be reversed, with costs to all parties appearing separately, to be paid out of the estate, and that the decree should be modified by providing that the appellant takes all of the certificates, both for principal and interest, issued by the State of Virginia, representing West Virginia's *pro rata* liability and the certificates issued by Brown Brothers & Co. therefor, which the testator held at the time of his death.

CLARKE, P. J., DOWLING, MERRELL and GREENBAUM, JJ., concur.

Decree, so far as appealed from, reversed, with costs to all parties appearing separately, to be paid out of the estate, and modified as directed in opinion.   Settle order on notice.